01

02

03

04

05                          UNITED STATES DISTRICT COURT
                       FOR THE EASTERN DISTRICT OF CALIFORNIA
06

07  MARTIN A. KILLINGSWORTH,              )
                                          )
08            Petitioner,                 )   CASE NO. 2:07-cv-01333-RSL-JLW
                                          )
09        v.                              )
                                          )
10  BOARD OF PAROLE HEARINGS,             )   REPORT AND RECOMMENDATION
                                          )
11            Respondent.                 )
    _____       )
12

13        I.      SUMMARY

14            Petitioner Martin Killingsworth is currently incarcerated at the California State Prison,

15  Solano in Vacaville, California.  He was convicted by a jury of attempted murder in the first

16  degree and assault with a firearm in Sacramento County Superior Court on June 15, 1994, and

17  sentenced to an indeterminate term of life with the possibility of parole.  (*See* Docket 9,

18  Exhibit 1 at 1-2.)  Petitioner was also subsequently convicted of possession of a controlled

19  substance for sale with a weapons enhancement on July 21, 1994.  (*See id*. at 2.)  Petitioner

20  has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging the 2006

21  denial of parole by the Board of Parole Hearings of the State of California (the "Board").[1]

22
    _____
            [1] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1,
    2005.  *See* California Penal Code § 5075(a).

    REPORT AND RECOMMENDATION -1

01  Respondent has filed an answer to the petition together with relevant portions of the state

02  court record, and petitioner has filed a traverse in response to the answer.  The briefing is now

03  complete and this matter is ripe for review.  The Court, having thoroughly reviewed the

04  record and briefing of the parties, recommends the petition be denied and this action be

05  dismissed with prejudice.

06      II.   BACKGROUND

07          During the hearing, the Board relied upon the description of the offense set forth by

08  the California Court of Appeal.  (*See* Dkt. 1, Ex. A at 7.)  The victim in this case, David

09  Jones, was at the Sutter Memorial Hospital in Sacramento to receive treatment for his hand,

10  which had been injured in a fight at his house the day of the shooting.  (*See id*. at 8.)  The

11  victim's girlfriend, Diane Matteson, and the estranged girlfriend of the defendant, Marie Bell,

12  accompanied the victim to the hospital.  (*See id*.)  Matteson and Jones were also acquainted

13  with petitioner.  (*See id*.)  Petitioner arrived at the hospital and began arguing with Bell, at

14  which time the victim told petitioner to leave because he was troubling Matteson.  (*See id*.)

15  Outside the emergency room, Bell hid from petitioner in some bushes while the victim and

16  Matteson called security for help.  (*See id*.) The hospital security guard responded, and as he

17  drove to the emergency room he saw a man in the hospital parking lot pushing a white Toyota

18  Celica through the lot.  (*See id*.)  The security guard got a good look at the man from

19  approximately five to eight feet away, and he identified him at trial as petitioner.  (*See id*.)

20  When the guard found Bell hiding in the bushes, she asked him, in a panic, whether he had

21  seen a man pushing a car.  (*See id*.)  The guard then drove Bell to Matteson's car.  (*See id*.)

22

01    As the victim, Matteson, and Bell drove away from the hospital together, Bell hid

02 from petitioner by lying down in the backseat.  (*See id*. at 8-9.)  Petitioner was sitting in his

03 car at the end of the street, waiting for Matteson's car to exit the hospital parking lot.  (*See id*.

04 at 9.)  A chase ensued, and then ended when petitioner blocked Matteson's car from entering

05 an intersection.  (*See id*.)  The victim got out of Matteson's car and approached petitioner's

06 vehicle.  (*See id*.)  According to Matteson's testimony at trial, she saw petitioner point a

07 handgun at the victim and fire.  (*See id*.)  After the victim fell to the ground, and started to

08 crawl away, while holding his chest, petitioner fired two or three more shots at the victim.

09 (*See id*.)  The victim's testimony confirmed Matteson's account of the crime.  (*See id*.)  On

10 the night of the shooting, Bell also told a Sacramento Police Officer that petitioner had shot

11 the victim.  (*See id*.)  At trial, however, after Bell had reconciled with petitioner and started

12 living with him, she denied having lifted her head up from the backseat.  (*See id*. at 9-10.)

13 Petitioner denied having shot the victim, and testified that he was out of town on the night of

14 the shooting.  (*See id*. at 10.)

15    Petitioner, through counsel, declined to discuss the details of the offense with the

16 panel during the hearing.  (*See id*. at 4-5.)  The Board, however, read into the record an

17 account of the crime given by petitioner during an interview on April 13th, 2004.  (*See id*. at

18 10-13.)  Petitioner stated that he was trying to locate Bell on the day of the shooting, and was

19 told that Bell had driven the victim to the hospital.  (*See id*. at 11.)  Earlier that day, the victim

20 had come to petitioner's home and accused him of pouring acid on Bell.  (*See id*.)  After

21 petitioner "[s]hined them on," the victim allegedly threatened to "take out" petitioner in the

22 future.  (*See id*.)  At the hospital that evening, after petitioner searched and waited for Bell,

Matteson and the victim cut off petitioner's vehicle as he attempted to exit the hospital

REPORT AND RECOMMENDATION -3

01  parking lot.  (*See id*. at 12.)  Matteson and the victim exited their car, and the victim began

02  hitting petitioner in his car with a metal rod.  (*See id*.)  After the two alleged assailants got

03  back in their vehicle and drove towards the hospital, petitioner started towards his home.  (*See*

04  *id*.)  While stopped at an intersection in his vehicle, Matteson's car pulled up behind his and

05  the rear window of his vehicle shattered.  (*See id*.)  Thinking that the victim had fired a gun at

06  him, he fired three rounds through the window at Matteson's vehicle and drove home.  (*See*

07  *id*.)  He later discovered that the window had been shattered by a baseball bat, and turned

08  himself in to police with an attorney.  (*See id*.)  Petitioner also claimed he would have turned

09  himself in to police earlier, but at the time of the offense he was in possession and under the

10  influence of marijuana.  (*See id*. at 13.)

11         Petitioner was convicted by a jury of attempted murder in the first degree and assault

12  with a firearm with two weapons enhancements on June 15, 1994, in the Sacramento County

13  Superior Court.  (*See* Dkt. 9, Ex. 1 at 1.)  He was sentenced to an indeterminate term of life

14  with the possibility of parole.  (*See id*.)  Petitioner was also subsequently convicted of

15  possession of a controlled substance for sale with a weapons enhancement on July 21, 1994,

16  and given a two-year sentence that runs concurrently with his life sentence.  (*See id*. at 2.)

17  Petitioner's minimum eligible parole date was set for January 28, 2001.  (*See* Dkt. 1, Ex. A at

18  1.)  The parole denial which is the subject of this petition took place after a parole hearing

19  held on May 31, 2006.  (*See id*.)  This was petitioner's fourth parole consideration hearing.

20  (*See id.* at 3.)  As of the date of the 2006 parole hearing, petitioner was forty-six-years-old,

21  and had been in custody approximately eleven years.  (*See id*., Ex. E at 1.)

22         After denial of his 2006 application, petitioner filed habeas corpus petitions in the

Sacramento County Superior Court, California Court of Appeal, and California Supreme

REPORT AND RECOMMENDATION -4

01  Court.  (*See* Dkt. 9, Exs. 6-8.)  Those petitions were unsuccessful.  (*See id*.)  This federal

02  habeas petition followed.  Petitioner contends the 2006 denial by the Board violated his Fifth

03  and Fourteenth Amendment Due Process rights.  Thus, petitioner does not challenge the

04  validity of his conviction, but instead challenges the Board's 2006 decision finding him

05  unsuitable for parole.

06          III.      STANDARD OF REVIEW

07          The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

08  petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

09  320, 326-27 (1997).  Because petitioner is in custody of the California Department of

10  Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

11  vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir.), *cert.*

12  *denied*, 543 U.S. 991 (2004) (providing that § 2254 is "the exclusive vehicle for a habeas

13  petition by a state prisoner in custody pursuant to a state court judgment, even when the

14  petitioner is not challenging his underlying state court conviction.").  Under AEDPA, a habeas

15  petition may not be granted with respect to any claim adjudicated on the merits in state court

16  unless petitioner demonstrates that the highest state court decision rejecting his petition was

17  either "contrary to, or involved an unreasonable application of, clearly established Federal

18  law, as determined by the Supreme Court of the United States," or "was based on an

19  unreasonable determination of the facts in light of the evidence presented in the State court

20  proceeding."  28 U.S.C. § 2254(d)(1) and (2).

21          As a threshold matter, this Court must ascertain whether relevant federal law was

22  "clearly established" at the time of the state court's decision.  To make this determination, the

Court may only consider the holdings, as opposed to dicta, of the United States Supreme

01  Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit

02  precedent remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

03   331 F.3d 1062, 1069 (9th Cir. 2003).

04      The Court must then determine whether the state court's decision was "contrary to, or

05  involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

06  *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

07  grant the writ if the state court arrives at a conclusion opposite to that reached by [the

08  Supreme] Court on a question of law or if the state court decides a case differently than [the]

09  Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

10  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

11  state court identifies the correct governing legal principle from [the] Court's decisions but

12  unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

13  times, a federal habeas court must keep in mind that it "may not issue the writ simply because

14  [it] concludes in its independent judgment that the relevant state-court decision applied clearly

15  established federal law erroneously or incorrectly.  Rather that application must also be

16  [objectively] unreasonable."  *Id.* at 411.

17      In each case, the petitioner has the burden of establishing that the state court decision

18  was contrary to, or involved an unreasonable application of, clearly established federal law.

19  *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

20  whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

21  state court decision because subsequent unexplained orders upholding that judgment are

22  presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

(1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

REPORT AND RECOMMENDATION -6

01    Finally, AEDPA requires federal courts to give considerable deference to state court

02 decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

03 Federal courts are also bound by a state's interpretation of its own laws.  *See Murtishaw v.*

04 *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

05 (9th Cir. 1993)).

06    IV.    FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

07    A.    *Due Process Right to be Released on Parole*

08    Under the Fifth and Fourteenth Amendments to the United States Constitution, the

09 government is prohibited from depriving an inmate of life, liberty or property without the due

10 process of law.  U.S. Const. amends. V, XIV.  A prisoner's due process claim must be

11 analyzed in two steps: the first asks whether the state has interfered with a constitutionally

12 protected liberty or property interest of the prisoner, and the second asks whether the

13 procedures accompanying that interference were constitutionally sufficient.  *Ky. Dep't of*

14 *Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d

15 1123, 1127 (9th Cir. 2006).

16    Accordingly, our first inquiry is whether petitioner has a constitutionally protected

17 liberty interest in parole.  The Supreme Court articulated the governing rule in this area in

18 *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482

19 U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

20 "the 'clearly established' framework of *Greenholtz* and *Allen"* to California's parole scheme).

21 The Court in *Greenholtz* determined that although there is no constitutional right to be

22 conditionally released on parole, if a state's statutory scheme employs mandatory language

that creates a presumption that parole release will be granted if certain designated findings are

REPORT AND RECOMMENDATION -7

01 made, the statute gives rise to a constitutional liberty interest.  *See Greenholtz*, 442 U.S. at 7,

02 12; *Allen*, 482 U.S. at 377-78.

03      As discussed *infra*, California statutes and regulations afford a prisoner serving an

04 indeterminate life sentence an expectation of parole unless, in the judgment of the parole

05 authority, he "will pose an unreasonable risk of danger to society if released from prison."

06 Title 15 Cal. Code Regs., § 2402(a).  The Ninth Circuit has therefore held that "California's

07 parole scheme gives rise to a cognizable liberty interest in release on parole."  *McQuillion*,

08 306 F.3d at 902.  To similar effect,  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) held

09 that California Penal Code § 3041 vests all "prisoners whose sentences provide for the

10 possibility of parole with a constitutionally protected liberty interest in the receipt of a parole

11 release date, a liberty interest that is protected by the procedural safeguards of the Due

12 Process Clause."  This "liberty interest is created, not upon the grant of a parole date, but

13 upon the incarceration of the inmate."  *Biggs v. Terhune*, 334 F.3d 910, 915 (2003).  *See also*

14 *Sass*, 461 F.3d at 1127.

15      Because the Board's denial of parole interfered with petitioner's constitutionally-

16 protected liberty interest, this Court must proceed to the second step in the procedural due

17 process analysis and determine whether the procedures accompanying that interference were

18 constitutionally sufficient.  "[T]he Supreme Court [has] clearly established that a parole

19 board's decision deprives a prisoner of due process with respect to this interest if the board's

20 decision is not supported by 'some evidence in the record.'"  *Irons*, 505 F.3d at 851 (citing

21 *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard

22 applies in prison disciplinary proceedings)).  The "some evidence" standard requires this

Court to determine "whether there is any evidence in the record that could support the

REPORT AND RECOMMENDATION -8

01 conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56.  Although *Hill*

02 involved the accumulation of good time credits rather than release on parole, later cases have

03 held that the same constitutional principles apply in the parole context because both situations

04 directly affect the duration of the prison term.  *See e.g., Jancsek v. Or. Bd. of Parole*, 833 F.2d

05 1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme

06 Court in *Hill* in the parole context); *Sass*, 461 F.3d at 1128-29 (holding the same); *Biggs*, 334

07 F.3d at 915 (holding the same); *McQuillion*, 306 F.3d at 904 (holding the same).

08      "The fundamental fairness guaranteed by the Due Process Clause does not require

09 courts to set aside decisions of prison administrators that have some basis in fact," however.

10 *Hill*, 472 U.S. at 456.  Similarly, the "some evidence" standard is not an invitation to examine

11 the entire record, independently assess witnesses' credibility, or re-weigh the evidence.  *Id.* at

12 455.  Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

13 *See id.* at 454.  The Court in *Hill* added an exclamation point to the limited scope of federal

14 habeas review when it upheld the finding of the prison administrators despite the Court's

15 characterization of the supporting evidence as "meager."  *See id.* at 457.

16      B.    *California's Statutory and Regulatory Scheme*

17      In order to determine whether "some evidence" supported the Board's decision with

18 respect to petitioner, this Court must consider the California statutes and regulations that

19 govern the Board's decision-making.  *See Biggs*, 334 F.3d at 915.  Under California law, the

20 Board is authorized to set release dates and grant parole for inmates with indeterminate

21 sentences.  *See* Cal. Penal Code § 3040 and 5075, *et seq.*  Section 3041(a) requires the Board

22 to meet with each inmate one year before the expiration of his minimum sentence and

normally set a release date in a manner that will provide uniform terms for offenses of similar

REPORT AND RECOMMENDATION -9

01  gravity and magnitude with respect to their threat to the public, as well as comply with

02  applicable sentencing rules.  Subsection (b) of this section requires that the Board set a release

03  date "unless it determines that the gravity of current convicted offense or offenses, or the

04  timing and gravity of current or past convicted offense or offenses, is such that consideration

05  of the public safety requires a more lengthy period of incarceration." *Id.*, § 3041(b).  Pursuant

06  to the mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

07  dates" which take into account the number of victims of the offense as well as other factors in

08  mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

09  setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

10  § 2402, *et seq.*

11      Accordingly, the Board is guided by the following regulations in making a

12  determination whether a prisoner is suitable for parole:

13          (a) General. The panel shall first determine whether the life
            prisoner is suitable for release on parole. Regardless of the
14          length of time served, a life prisoner shall be found unsuitable
            for and denied parole if in the judgment of the panel the
15          prisoner will pose an unreasonable risk of danger to society if
            released from prison.

16
            (b) Information Considered. All relevant, reliable information
17          available to the panel shall be considered in determining
            suitability for parole. Such information shall include the
18          circumstances of the prisoner's social history; past and present
            mental state; past criminal history, including involvement in
19          other criminal misconduct which is reliably documented; the
            base and other commitment offenses, including behavior before,
20          during and after the crime; past and present attitude toward the
            crime; any conditions of treatment or control, including the use
21          of special conditions under which the prisoner may safely be
            released to the community; and any other information which
22          bears on the prisoner's suitability for release. Circumstances
            which taken alone may not firmly establish unsuitability for

REPORT AND RECOMMENDATION -10

01               parole may contribute to a pattern which results in a finding of
unsuitability.

02

03 15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability

04 factors to further assist the Board in analyzing whether an inmate should be granted parole,

05 although "the importance attached to any circumstance or combination of circumstances in a

06 particular case is left to the judgment of the panel." 15 CCR § 2402(c).

07        In examining its own statutory and regulatory framework, the California Supreme

08 Court in *In re Lawrence* recently held that the proper inquiry for a reviewing court is

09 "whether some evidence supports the *decision* of the Board … that the inmate constitutes a

10 current threat to public safety, and not merely whether some evidence confirms the existence

11 of certain factual findings." *Id.*, 44 Cal.4th 1181, 1212 (2008).  The court also asserted that

12 the Board's decision must demonstrate "an individualized consideration of the specified

13 criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability factors that

14 forms the crux of the parole decision; the significant circumstance is how those factors

15 interrelate to support a conclusion of current dangerousness to the public." *Id*. at 1204-05,

16 1212.  As long as the evidence underlying the Board's decision has "some indicia of

17 reliability," parole has not been arbitrarily denied. *See Jancsek*, 833 F.2d at 1390.  As the

18 California courts have continually noted, the Board's discretion in parole release matters is

19 very broad. *See Lawrence*, 44 Cal.4th at 1204.  Thus, the penal code, corresponding

20 regulations, and California law clearly establish that the fundamental consideration in parole

21 decisions is public safety and an assessment of a prisoner's current dangerousness. *See id.*,

22 at 1205-06.

01        C.    *Summary of Governing Principles*

02        By virtue of California law, petitioner has a constitutional liberty interest in release on

03   parole.  The parole authorities may decline to set a parole date only upon a finding that

04   petitioner's release would present an unreasonable present risk of danger to society if he is

05   released from prison.  Where the parole authorities deny release, based upon an adverse

06   finding on that issue, the role of a federal habeas court is narrowly limited.  It must deny relief

07   if there is "some evidence" in the record to support the parole authority's finding of present

08   dangerousness.  The penal code, corresponding regulations, and California law clearly support

09   this definition of the issues.

10        V.    PARTIES' CONTENTIONS

11        Petitioner contends that the Board violated his federal due process rights by finding

12   him unsuitable for parole without some evidence that he poses an unreasonable risk of danger

13   to society if released from prison.  (*See* Dkt. 1 at10-27.)  Specifically, petitioner claims there

14   was no evidence to support the Board's finding that he lacked insight or remorse for the

15   offense.  (*See id*. at 15-17.)  Petitioner also argues that the Board has systematically released

16   prisoners who committed attempted murders similar to petitioner's offense, which amounts to

17   inconsistent application of the parole guidelines in violation of the Equal Protection Clause.

18   (*See id*. at 13-15.)  Finally, petitioner asserts that the Board violated "the *Rutherford* decision

19   [which] held that the BPH may not deny further parole consideration for more than one year

20   in the case of prisoners who have formerly been denied for one year, absent a significant

21   change in circumstances which must be clearly stated on the record."  (*See id*. at 21-22.)

22        Respondent claims that petitioner does not have a constitutionally protected liberty

interest in being released on parole, that the "some evidence" standard is inapplicable in this

REPORT AND RECOMMENDATION -12

01  context, and that even if he does have a protected liberty interest, the Board adequately

02  predicated its denial of parole on "some evidence." (*See* Dkt. 9 at 6-11.)  Accordingly,

03  respondent argues that petitioner's constitutional rights were not violated by the Board's 2006

04  decision, and the Sacramento County Superior Court's Order upholding the Board's 2006

05  parole denial was not an unreasonable application of clearly established federal law.  (*See id.*

06  at 10-11.)

07          VI.       ANALYSIS OF RECORD IN THIS CASE

08          A.       *State Court Proceedings*

09          Petitioner's habeas petitions filed in the California Court of Appeal and California

10  Supreme Court contained the same claims as his Sacramento County Superior Court petition,

11  and both petitions were summarily denied.  (*See id.*, Exs. 6-8.)  The parties agree that

12  petitioner has properly exhausted his state court remedies, and timely filed the instant petition.

13  (*See* Dkt. 1 at 6; Dkt. 9 at 4.)  This Court reviews the Sacramento County Superior Court's

14  Order upholding the Board's decision to determine whether it meets the deferential AEDPA

15  standards, as it is the last reasoned state court decision.  *See Ylst*, 501 U.S. at 803-04.

16          B.       *Petitioner's Due Process Claim*

17          The Board based its decision that petitioner was unsuitable for parole primarily upon

18  his commitment offense, but also cited his criminal history, unstable social history, and failure

19  to demonstrate insight and remorse.  (*See* Dkt. 1, Ex. A at 57-65.)  The Board's findings

20  tracked the applicable unsuitability and suitability factors listed in § 2402(b), (c) and (d) of

21  title 15 of the California Code of Regulations.  After considering all reliable evidence in the

22  record, the Board concluded that evidence of petitioner's positive behavior in prison did not

outweigh evidence of his unsuitability for parole.  (*See id.* at 57.)

01        The Board primarily relied upon the circumstances of petitioner's commitment offense

02  to find petitioner unsuitable for parole.  (*See id*. at 57-58.)  The Board found that "[m]ultiple

03  victims were attacked; one was injured during the incident.  It was carried out with a callous

04  disregard for human suffering and the motive for the crime is – is inexplicable from our

05  standpoint."  (*Id*. at 57-58.)  *See* 15 CCR § 2402(c)(1)(A), (D) and (E).  Based upon the

06  statement of facts provided by the Court of Appeal, it appeared petitioner was stalking his

07  girlfriend when he sought to confront her at the hospital, and his actions caused her great

08  apprehension.  (*See* Dkt. 1, Ex. A at 58.)  After she got in a car to try to escape, "[petitioner]

09  then followed that car, cut them off and then the circumstances which ultimately resulted in

10  the shooting occurred."  (*Id*.)  The Board noted that although some details of the offense may

11  not be clear, the Court of Appeal clearly found that petitioner was "the initiator in this action,"

12  and the confrontation was "the result of [petitioner's] continuing to either get at [his]

13  girlfriend because she was breaking up with him or because [petitioner] thought something

14  was going on with her and her friends."  (*Id*.)  The circumstances surrounding petitioner's

15  commitment offense provides "some evidence" to support the Board's conclusion that

16  petitioner would present an unreasonable risk of danger to society if released from prison.

17        The second unsuitability factor relied upon by the Board was petitioner's criminal

18  history.  The Board is required to consider prisoners' "past criminal history, including

19  involvement in other criminal misconduct which is reliably documented…."  15 CCR §

20  2402(b).  The Board asserted that although petitioner had a "minimal if any criminal history"

21  documented by law enforcement, his "drug offense, weapons offense and the description of

22  the circumstances surrounding that offense, indicated [that petitioner] was in possession of

significant quantities of controlled substances," and was therefore substantially involved in

REPORT AND RECOMMENDATION -14

01  other criminal activity prior to the commitment offense.  (*See id*. at 58-59.)  The Board noted

02  petitioner had "[p]araphernalia which indicated [he] had those controlled substances for sale,

03  the amount of cash [he] had at the time certainly reasonably leads to the supposition that [he

04  was] in the drug distribution business at that point."  (*Id*. at 59.)  Thus, there was "some

05  evidence" in the record to support the Board's conclusion that due to petitioner's criminal

06  history, he was unsuitable for parole.

07          The third factor relied upon by the Board was petitioner's unstable social history.  The

08  Board based its finding entirely upon petitioner's abuse of illegal drugs, such as petitioner's

09  use of controlled substances at the time of the offense.  (*See id*. at 59.)  An "unstable social

10  history," however, is defined as a "history of unstable or tumultuous relationships with

11  others."  *See* 15 CCR § 2402(c)(3).  By contrast, a "stable social history" is defined as

12  "reasonably stable relationships with others" and is a factor tending to show parole suitability.

13  *See id.*, § 2402(d)(2).  Petitioner's history of drug abuse, without more, does not appear to

14  satisfy the definition of an "unstable social history."  *See id.*, § 2402(c)(3).  There is other

15  evidence in the record, however, which does indicate that petitioner has a history of "unstable

16  or tumultuous relationships with others," such as his relationship with his estranged girlfriend,

17  Bell.  The Court of Appeal found that petitioner was stalking Bell at the time of the

18  commitment offense, and the Board's decision noted that "this crime smacks of domestic –

19  potential domestic violence…."  (*See* Dkt. 1, Ex. A at 58 and 62.)  Thus, there was "some

20  evidence" in the record to support the Board's finding that petitioner has an unstable social

21  history, albeit on a different basis.

22          The fourth and fifth factors relied upon by the Board to deny parole were petitioner's

    failure to demonstrate insight and remorse regarding the commitment offense.  (*See id*. at 60-

REPORT AND RECOMMENDATION -15

01   62.)  The Board explained the basis for its findings at length during the hearing.

> You've taken numerous self-help classes and when we seek to determine the effect – the beneficial effect of those self-help classes … [we reach] a stopping point because it is clear to the Panel that despite your utilization of the words, "I have remorse; I accept responsibility for what happened," that when we look at the varying versions of [the offense] you've told, that your credibility in this regard is significantly lacking and you start out by denying your crime and by giving various versions at various times during the course of your incarceration.  We're not talking about different nuances of explaining this because one consistency that runs through all of these descriptions is not your acceptance of responsibility but your evasion of responsibility.  First clearly by your denial and then at each subsequent telling by insisting that your actions were in response to the actions of others … so to the extent that we're called upon to consider … [whether] remorse is reflected by understanding of the circumstances that involved you in this crime … [t]he evidence there is completely lacking.

(*See id*. at 60-61.)

The Board acknowledged that petitioner's psychological evaluations have all been favorable, including the most recent report, which was completed on August 9, 2005.  (*See id*. at 61.)  Because all the evaluations "accept without question [petitioner's] version of what occurred," however, the Board found them unreliable.  (*Id*. at 61.)  "[I]t is the Panel's belief that those opinions are not supported by an in-depth evaluation of the facts and circumstances of the offense so to the extent that we're supposed to affirmatively consider remorse or understanding – those factors are absent."  (*Id*.)  Finally, the Board commented that "this crime smacks of domestic – potential domestic violence … [it] has those markings, stalking, drug induced paranoia … but those [possibilities] haven't been addressed there either by any of the psychologists or most importantly by [petitioner] and that's our concern."  (*Id*. at 62.)

REPORT AND RECOMMENDATION -16

01 Based upon the drastic discrepancies between petitioner's version of the events

02 leading up to and culminating in the attempted murder, and the facts set forth by the

03 Court of Appeal, the Board could reasonably conclude that petitioner has failed to

04 demonstrate insight and remorse in a credible manner.

05      Petitioner's argument that the Board's findings were improper because his

06 credibility is irrelevant to the Board's suitability determination is incorrect.  (*See* Dkt.

07 1 at 17.)  A prisoner's credibility is a key aspect of the Board's consideration of "all

08 relevant, reliable information … [including a prisoner's] past and present attitude

09 toward the crime," in order to make a judgment about whether that prisoner would

10 pose an unreasonable risk of danger to society if released.  *See* 15 CCR § 2402(a) and

11 (b).  As the superior court asserted, "the BPH acted well within their authority when

12 they evaluated the credibility of [petitioner's statements] and concluded that, based on

13 his various versions of the offense and failure to accept full responsibility, petitioner

14 actually lacked remorse and insight.  Contrary to petitioner's belief, credibility is

15 always an issue that must be considered by a decision-maker in weighing the facts

16 before him/her." (*See* Dkt. 1, Ex. O at 3.)  During the hearing, the Board provided

17 petitioner with ample opportunity to clarify the discrepancies between his prior

18 versions of the commitment offense, as well as respond to the Board's concern that

19 these discrepancies call petitioner's credibility into question.  (*See id*., Ex. A at 27-36.)

20 The Board's finding that petitioner failed to demonstrate insight and remorse in a

21 credible manner was therefore supported by "some evidence" in the record.

22      Contrary to petitioner's argument that the Board failed to consider or give

appropriate weight to the parole suitability rules which favored petitioner, the Board

REPORT AND RECOMMENDATION -17

01  acknowledged that petitioner has performed "admirably" as an inmate.  (*See* Dkt. 1 at

02  20-21; *id*.; Ex. A at 59.)  The Board commended petitioner for being discipline-free

03  during the entire period of his incarceration, and for his development of marketable

04  skills and a commendable work record.  (*See id*., Ex. A at 59.)  The Board also noted

05  that petitioner has stable parole plans, and good family connections and support.  (*See*

06  *id*. at 62.)  It is therefore an inaccurate characterization of the record to say that the

07  Board failed to provide petitioner with an individualized consideration of all relevant

08  parole suitability factors.  (*See* Dkt. 1 at 15-21.)  As mentioned above, the Board has

09  broad discretion to determine how suitability and unsuitability factors interrelate to

10  support its conclusion of current dangerousness to the public.  *See Lawrence*, 44

11  Cal.4th at 1212.  It ultimately concluded, however, that petitioner remains an

12  unreasonable risk of danger to society, and these findings were supported by "some

13  evidence" in the record.  (*See* Dkt. 1, Ex. A at 57.)

14      C.      *Petitioner's Equal Protection Claim*

15          Petitioner also contends that his right to equal protection under the Fourteenth

16  Amendment was violated when the Board found him unsuitable for parole.  (*See* Dkt. 1 at 13-

17  14.)  Specifically, he asserts that the parole consideration guidelines have been applied in an

18  inconsistent manner, as demonstrated by the fact that "numerous prisoners committed similar

19  attempted murders, yet have systematically been released [after] serving less time [than

20  petitioner]."  (*Id*.)  The petition offers little analysis in support of his claim, and respondent

21  fails to address this issue on the merits.  (*See id*. and Dkt. 9).  California law does not require

22  the Board to conduct a comparative analysis of the period of confinement served by other

    prisoners with similar crimes, nor does it require it to refer to the sentencing matrices.  *See In*

01  *re Dannenberg*, 34 Cal.4th 1061, 1083-84 (2005) (holding whether an inmate poses a current

02  danger is not dependent upon whether his commitment offense was more or less egregious

03  than other, similar crimes).  Instead, the Board is required to review the specific facts of each

04  case and to make an individualized determination of whether that prisoner is suitable for

05  parole.  *See Law*rence, 44 Cal.4th at 1221.  Petitioner's allegations, without more, fail to

06  establish an equal protection violation.  The Court therefore finds "some evidence" in the

07  record to support the Board's decision and finds no constitutional violation occurred.

08          D.      *Petitioner's* Rutherford *Claim*

09          Petitioner claims that the Board violated his due process rights by denying him another

10  parole consideration hearing for two years without describing a "significant change in

11  circumstances" on the record during his 2006 hearing.  (*See* Dkt. 1 at 21; *id*., Ex. A at 63-65.)

12  Specifically, he asserts that "[t]he *Rutherford* decision held that the BPH may not deny further

13  parole consideration for more than one year in the case of prisoners who have formerly been

14  denied for one year, absent a significant change in circumstances which must be clearly stated

15  on the record."  (*See* Dkt. 1 at 21.)  As explained below, petitioner's arguments are

16  unavailing, and the California Court of Appeal has reversed the decision upon which

17  petitioner relies.

18          This court is aware of no decision of the U.S. Supreme Court holding that a decision

19  by a parole board to defer further parole consideration for two years, instead of one, is a

20  violation of federal due process rights.  Petitioner cites no such decision.  "The *Rutherford*

21  decision" to which petitioner refers was a decision of the Marin County Superior Court in a

22  case involving a life-term inmate at the San Quentin State Prison.  He filed a habeas corpus

petition contending that the Board failed to conduct his subsequent parole consideration

REPORT AND RECOMMENDATION -19

01   hearing in a timely manner in violation of his due process rights and the requirements of

02   California Penal Code § 3041.5(b)(2).  *See In re Inez Tito Lugo*, 164 Cal.App.4th 1522, 1529

03   (2008).[2]  The trial court sustained an argument that the Board should not issue multi-year

04   denials in cases in which inmates had previously received a one-year parole denial absent a

05   statement of a "significant change in circumstances" on the record.  *See id*. at 1532.

06   The Court of Appeal reversed, however, finding that the trial court's order "violated

07   the separation of powers and intrudes upon the inherent discretion afforded to the Board to

08   decide parole matters."  *Id.* at 1540.  After summarizing the requirements set forth by

09   § 3041.5, the Court of Appeal observed that "[t]he statute contains no requirement that the

10   Board must find a significant change in circumstances justifying a multi-year denial following

11   a one-year denial."  [3]  *Id*. at 1537.  "The Board's decision to defer annual parole consideration

12   hearings is guided by the same criteria used to determine parole suitability … [and the]

13   reasons for postponing the next scheduled parole hearing need not be completely different

14   from the reasons for denying parole suitability."  *Id.*  Furthermore, "the Board need not point

15   to additional evidence supporting its departure from the discretionary decisions of earlier

16   panels."  *Id*. at 1539, fn.9.

17   Because the requirements of procedural due process impose some limitations upon the

18   executive branch's broad discretionary powers in parole matters, the Court of Appeal held

19   that "[t]he 'some evidence' standard of review governs consideration of a Board decision to

20

21   [2] An order entered by the Marin County Superior Court on May 5, 2006, appointed Inez Tito Lugo as the class representative in place of the original petitioner, Jerry Rutherford, who died after this lawsuit

22   commenced.  *See id*. at 1532.
    [3] Text amendments to § 3041.5(b)(2) became effective on November 5, 2008, approximately four months after the Court of Appeal's July 21, 2008, decision in *Lugo*.  The amended version of § 3041.5 also omits such a requirement.  *See* Cal. Penal Code § 3041.5(b)(2).

REPORT AND RECOMMENDATION -20

01  postpone the next scheduled parole hearing by issuing a multi-year denial." *Id*. at 1537.

02  Therefore, a reviewing court might be justified in closely scrutinizing a decision issuing a

03  multi-year denial in the case of an inmate who has "consistently received one-year denials of

04  parole and then received a multi-year denial" to ensure that the Board's decision was

05  supported by "some evidence" in the record, but that reviewing court must remain mindful

06  that "some evidence is all that is required." *Id*. at 1539, fn.9.

07  Assuming *arguendo* the length of time between parole hearings implicates federal due

08  process rights, this Court must determine whether there was "some evidence" in the record to

09  support the Board's decision to postpone petitioner's next parole hearing for two years, even

10  though he received one-year denials at prior hearings.  During petitioner's 2006 hearing, the

11  Board explained that a multi-year denial was appropriate "[b]ased upon the enormity of the

12  offense and the length of time that [the Board's concerns] have been discussed with

13  [petitioner] in one form or another" by previous panels, but not addressed appropriately by

14  petitioner before the next hearing.  (*See* Dkt. 1, Ex. A at 63.)  The Board therefore issued a

15  separate decision finding it "not reasonable to expect that parole would be granted at a hearing

16  during the following two years…." (*Id*. at 63-64.)  During this portion of the panel's decision,

17  petitioner got up and walked out of the hearing, which the Board interpreted as a signal that

18  petitioner was unwilling to listen to the Board's recommendations.  (*See id*. at 64-65.)  Based

19  upon the Board's reasoning as described in its decision, there was "some evidence" in the

20  record to support the Board's finding that a multi-year denial of parole was appropriate in

21  petitioner's case.

22

01        E.      *Sacramento County Superior Court's Decision*

02        In a reasoned decision denying petitioner's request for habeas relief, the Sacramento

03   County Superior Court carefully summarized and addressed each of petitioner's claims.  (*See*

04   *id*., Ex. O at 1-2.)  With respect to petitioner's federal due process claim, the superior court

05   found that there was "some evidence" in the record to support the Board's finding that

06   petitioner was unsuitable for parole.  (*See id.* at 2-3.)  The fact that petitioner happens to

07   disagree with "the Appellate Court's description of the circumstances surrounding the

08   offense, the statement of facts relied on by the BPH in denying parole, is irrelevant."  (*Id*. at

09   3.)  In addition, the superior court upheld the Board's finding that petitioner lacked remorse or

10   insight into the crime because the panel members "acted well within their authority when they

11   evaluated the credibility of [petitioner's statements] and concluded that, based on his various

12   versions of the offense and failure to accept full responsibility, petitioner actually lacked

13   remorse and insight [because] credibility is always an issue that must be considered by a

14   decision-maker in weighing the facts before him/her." (*Id*.)  Specifically, "[i]n contradiction

15   to the evidence presented at trial, petitioner tried to paint himself as more of a reactive

16   participant who merely fired at the victim in self-defense, rather than the aggressive stalker

17   who initiated the final confrontation and shooting."  (*Id*. at 4.)  The superior court further held

18   that petitioner's Equal Protection Claim is unavailing, because "*Dannenberg* rejected

19   petitioner's argument that comparative proportionality analysis should have been conducted at

20   his parole hearing…."  (*Id*. at 2.)  Finally, the court asserted that petitioner's *Rutherford* claim

21   lacks merit under the express requirements of California Penal Code § 3041.5(b)(2).  (*See id*.

22   at 4.)

01      VII.    CONCLUSION

02          As stated above, it is beyond the authority of a federal habeas court to determine

03  whether evidence of suitability outweighs the circumstances of the commitment offense,

04  together with any other reliable evidence of unsuitability for parole.  The Board has broad

05  discretion to determine how suitability and unsuitability factors interrelate to support its

06  conclusion of current dangerousness to the public.  *See Lawrence*, 44 Cal.4th at 1212.

07  Although the Board praised petitioner's good behavior and progress in prison, it determined

08  that petitioner remains an unreasonable risk of danger to society if released on parole.

09  Because the state court decision upholding the Board's findings satisfies the "some evidence"

10  standard, there is no need to reach respondent's argument that another standard applies.

11          Given the totality of the Board's findings, there is "some evidence" that petitioner

12  currently poses a threat to public safety, and the Sacramento County Superior Court's Order

13  upholding the Board's decision was not contrary to, or an unreasonable application of, clearly

14  established federal law, or based on an unreasonable determination of facts.  I therefore

15  recommend that the Court find that petitioner's due process rights were not violated, and that

16  it deny his petition and dismiss this action with prejudice.

17          This Report and Recommendation is submitted to the United States District Judge

18  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

19  after being served with this Report and Recommendation, any party may file written

20  objections with this Court and serve a copy on all parties.  Such a document should be

21  captioned "Objections to Magistrate Judge's Report and Recommendation."  Failure to file

22  objections within the specified time may waive the right to appeal the District Court's Order.

REPORT AND RECOMMENDATION -23

01 *See Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A proposed order accompanies this

02 Report and Recommendation.

03          DATED this 25th day of August, 2009.

04

05

06                                          JOHN L. WEINBERG
                                            United States Magistrate Judge

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION -24